**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

FREEDOM WATCH, INC.,
c/o 7050 W. Palmetto Park Rd
Boca Raton FL 33433

                Plaintiff,

        v.                                Case Number:

YOUTUBE, LLC
901 Cherry Avenue
San Bruno, CA, 94066

And

SUNDAR PICHAI
1600 Amphitheatre Pkwy
Mountain View, CA, 94043

                Defendants.

_____

## COMPLAINT

    Plaintiff, FREEDOM WATCH, INC. ("Freedom Watch") hereby files this action against

Defendants YOUTUBE, LLC ("YouTube"), SUNDAR PICHAI. ("Pichai"), and GOOGLE LLC

("GOOGLE") for declaratory and injunctive relief.

### JURISDICTION AND VENUE

    1.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 1332,

28 U.S.C. §§ 2201-2202, and the Constitution of the United States for the unconstitutional

violation of the First Amendment right to free speech as pleaded below.

1

2.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2), (d), and (e)(1). A substantial part of the events giving rise to this claim occurred in this District.

## THE PARTIES

3.     Plaintiff Freedom Watch is a non-profit political interest group dedicated to preserving American freedom by (i) protecting Americans' constitutional rights to privacy, free speech, and civil liberties, (ii) protecting America from corrupt business, labor, and government officials and their practices, (iii) preserving America's freedom from foreign oil, (iv) preserving our national sovereignty against the terrorist state-controlled United Nations and socialistic, globalist interests, and (v) re-establishing the rule of law in America's legal system.   By promoting true American values at home and around the world through concrete action – often utilizing hard-hitting legal cases and citizens grand juries – and through public advocacy and education in the media -- FREEDOM WATCH is at the forefront of preserving American freedom for today's and succeeding generations.

4.     As a non-profit, educational organization formed under 26 U.S.C. § 501(c)(3), Plaintiff FREEDOM WATCH depends on free access to the public square as a means for (i) participating in public debate, (ii) educating the public and disseminating its message to concerned American citizens and others around the world, and (iii) raising the funds necessary to support the effective and robust delivery of its message.   In today's Internet age, Freedom Watch's ability to effectively access the public square depends heavily on unconstrained access to Internet-based social media platforms.   When operated free of inappropriate censorship and discrimination, these social media platforms enable free and robust public debate, discussion,

2

and education and provide organizations such as Freedom Watch with broad-based, real-time access to interested citizens and critical funding sources on a subscription-free basis. They enable Freedom Watch to efficiently and cost-effectively reach millions of Americans and efficiently perform its function as a Section 501(c)(3) educational non-profit foundation.

5.     Defendant YouTube is California limited liability company with its principal place of business located at 901 Cherry Ave, San Bruno, CA.

6.     Defendant Pichai is the CEO of Google, Inc., and Alphabet, Inc., and is therefore primarily responsible for the actions of YouTube.

## BACKGROUND FACTS

7.     YouTube operates as a wholly-owned subsidiary of Google and Alphabet.

8.     In 2020, YouTube boasted 37 million channels and 1.3 billion users, with three hundred (300) hours of video uploaded every minute and five (5) billion videos launched every day. It is one of the largest and most popular video distribution platforms on the Internet. It has more than four (4) billion hours of videos viewers every month, and an estimated five hundred (500) hours of video content are uploaded to YouTube every passing minute.

9.     As of As of 2018, YouTube's estimated worth was $160 billion.

10.     YouTube's Community Standards Guidelines regarding hate speech, incitement, or praise of violence are vague, broad, ill-defined, or not defined at all.

11.     YouTube's Community Standards Guidelines on Hate Speech provide:

Hate speech is not allowed on YouTube. We remove content promoting violence or hatred against individuals or groups based on any of the following attributes: Age, Caste, Disability, Ethnicity, Gender Identity and Expression, Nationality,

Race, Immigration Status, Religion, Sex/Gender, Sexual Orientation, Victims of a major violent event and their kin, Veteran Status.

12.     Defendant Pichai is the Chief Executive Officer of Google, Inc. and the Chief Executive Officer of Alphabet, Inc., the parent company of Google.

13.     Defendant Pichai exercises control over and implementation of the content and policy of YouTube and has spoken on behalf of and represented YouTube at Congressional hearings.

14.     Democrat legislators have long feared conservatives, including President Donald Trump's skilled use of social media as a threat to their own re-election efforts. These legislators exerted overt coercion, using both words and actions, to have Defendants censor the views and content with which Democrat Members of Congress disagreed, including those of Freedom Watch. Most recently, even President Joe Biden and the White House admittedly pressured and directed Defendants to censor content that was critical of the government for not fully disclosing the risks and negative reactions and side-effects of the Covid-19 vaccines, as well as related matters.

15.     Not only did Democrat legislators openly voice their displeasure with Defendants for providing a platform to conservatives, but they also spoke publicly of the steps they would take against Defendants if Defendants continued to provide a platform for the expression of views and content contrary to the legislators' own agendas.

16.     Legislators (and in one instance Michelle Obama, the former First Lady) made it increasingly clear that they wanted conservatives and the views and content they espoused, to be banned from Defendants' platform. So too has President Biden and his White House and

administration.

17.     With Defendants purportedly shielded from liability for engaging in censorship by Section 230, the Democrat legislators then wielded that immunity, combined with threats to revoke that immunity or otherwise to regulate Defendants, to use Defendants as a tool to effect censorship and viewpoint discrimination against conservatives that the Democrat legislators knew they could not accomplish on their own.

18.     Below are just some examples of Democrat legislators threatening new regulations, antitrust breakup, and removal of Section 230 immunity for Defendants and other social media platforms if YouTube did not censor views and content with which these Members of Congress disagreed, including the views and content of conservatives like Freedom Watch and President Trump:

> •      But I do think that for the privilege of 230, there has to be a bigger sense of responsibility on it. And it is not out of the question that that could be removed." (Rep. Nancy Pelosi, Speaker of the House, April 12, 2019);

> •      "The idea that it's a tech company is that Section 230 should be revoked, immediately should be revoked, number one. For Pichai and other platforms." (Joe Biden/Interview in December of 2019 and published January 2020);

> •      "We can and should have a conversation about Section 230. – and the ways in which it has enabled platforms to turn a blind eye as their platforms are used to . . . enable domestic terrorist groups to organize violence in plain sight." (Statement of US Sen. Mark Warner on Section 230 Hearing on October 28, 2020.);

> •      "It's long past time to hold the social media companies accountable for what's published on their platforms." (Bruce Reed, Biden's Top Tech Advisor/December 2, 2020);

> •      @jack (Jack Dorsey) Time to do something about this Tweet. (Sen. Kamala Harris'Tweet, October 2, 2019);

• 2020 Presidential candidate Sen. Kamala Harris calls on Twitter to suspend President Trump's account – (ABC News (go.com) October 2, 2019);

• If the president goes on Facebook and encourages violence, that you will make sure your company's algorithms don't spread that content and you will immediately remove those messages? (Sen. Markey October 28, 2020 (Zuckerberg Senate Testimony));

• "Senator, yes. Incitement of violence is against our policy and there are not exceptions to that, including for politicians." Mark Zuckerberg response, (November 17, 2020, Mark Zuckerberg and Jack Dorsey, Senate Tech Hearing);

• "…Daily, the president shocks our conscience and shakes the very foundations of our democracy using a powerful megaphone, social media. The President has used this microphone to spread vicious falsehoods and an apparent attempt to overturn the will of voters… Now, Mr. Zuckerberg and Mr. Dorsey, you have built terrifying tools of persuasion and manipulation with power far exceeding the robber barons of the last Gilded Age." (Sen. Blumenthal (13:35) October 23, 2020: Tech CEO's Senate Testimony)

• I have urged, in fact, a breakup of tech giants because they've misused their bigness and power. And indeed Section 230 reform, meaningful reform, including even possible repeal in large part because their immunity is way too broad and victims of their harms deserve a day in court. (Sen. Blumenthal (14:48) October 23, 2020: Tech CEO's Senate Testimony);

• "Now is the time for Silicon Valley companies to stop enabling this monstrous behavior and go even further than they have already by permanently banning this man (Trump) from their platforms. (Michelle Obama on Twitter, January 7, 2021);

• "The law (230) acts as a shield allowing them (Internet platforms) to turn a blind eye. The SAFE TECH ACT brings 230 into the modern age and makes platforms accountable for the harm they cause." (Sen. Mazie Hirono's Tweet, February 5, 2021);

• Before the hearing the following statement was issued by the respective Democrat Chairmen. "This hearing will continue the Committee's work of holding online platforms accountable for the growing rise of misinformation and disinformation. Industry self- regulation has failed. We must begin the work of changing incentives driving social media companies to allow and even promote

misinformation and disinformation." (March 2021 Joint Hearing of the Communications and Technology Subcommittee); and

•       "There's no Constitutional protection for using social media to incite an insurrection. Trump is willing to do anything for himself no matter the danger to our country. His biglies have cost America dearly. And until he stops, YouTube must ban him. Which is to say, forever."  (Rep. Adam Schiff's Tweet, May 5, 2021).

19.     Democrat Legislators not only voiced their threats (e.g., new regulations and removing Section 230 immunity) to social media platforms, but they also employed additional measures to deliver their unmistakable message that they were prepared to act against the social media platforms if Defendants did not increase their censorship of disfavored views and content of conservatives like Freedom Watch.

20.      These additional measures included convening public hearings, issuing subpoenas, dragging in the CEOs of the largest social media companies to testify publicly before Congress, and subjecting these CEOs to lengthy, embarrassing questioning.

21.     Some specific examples of these coercive actions were extended on Defendants:

On July 29, 2020, Four Big Tech CEOs testified before the House in an antitrust hearing.Amazon Founder and CEO Jeff Bezos, Facebook Founder and CEO Mark Zuckerberg, Apple CEO Tim Cook, and Pichai attempted to defend their companies against accusations of anticompetitive practices. (Online Platforms and Market Power, Part 6: Examining the Dominance of Amazon, Apple, Facebook, and Google | U.S. House of Representatives Judiciary Committee); and

On October 23, 2020, Mark Zuckerberg Testimony Transcript: Zuckerberg Testifies on Facebook Cryptocurrency Libra and Is Confronted on Child Exploitation on Facebook. (Zuckerberg Testifies on Facebook Cryptocurrency Libra | October 23, 2019); and

On November 17, 2020, Facebook CEO Mark Zuckerberg and Twitter CEO Jack Dorsey testified before the Senate Judiciary Committee on November 17. They were questioned on speech moderation policies. (Censorship, Suppression, and the 2020 Election | Hearings | November 17, 2020); and

On March 25, 2021, Facebook's Mark Zuckerberg, Twitter's Jack Dorsey, and Pichai appeared virtually before the House Energy and Commerce Committee. (House Hearingon Combating Online Misinformation and Disinformation | March 25, 2021)

22.    With this coercion directed at Defendants by repeatedly requiring their appearance at hearings, and reinforcing their potential to impose regulations, and strip them of 230 immunity, Democrat legislators intended to force Defendants into disrupting Freedom Watch's and it's subscribers access to its YouTube channel, its subscribers viewership, and the public at large. The ancillary benefit was to deny the public access to Freedom Watch's content and views.

23.    The message conveyed by Democrat legislators to Defendants was clear: use the authority of Section 230 to ban conservatives who uploaded content and views contrary to those legislators' preferred points of view or lose the competitive protections of Section 230 and tens of billions of dollars of market share altogether.

24.    YouTube is currently one of the largest social media platforms. Its very existence and growth have been directly fueled by Congressional legislation.

25.    In 1996, Congress passed the Communications Decency Act of 1996, which amended the Telecommunications Act of 1934 Section 230(c) intending to promote the growth and development of social media platforms, as well as protect against the transmission of obscene materials over the Internet to children.

26.     It is Congressional legislation commonly referred to as simply Section 230, or the "Good Samaritan" provision, that YouTube relies on to censor constitutionally permissible free speech from conservatives like Freedom Watch.

27.     Section 230(c) provides:

TREATMENT OF PUBLISHER OR SPEAKER. No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

CIVIL LIABILITY: No provider or user of an interactive computer service shall be held liable on account of—any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers being obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).

28.     Section 230(c) has accomplished and exceeded its original purpose in terms of promoting the growth and development of social media platforms.

29.     For example, YouTube is one of the largest and most popular video distribution platforms on the Internet. It has more than four (4) billion hours of video views every month, and an estimated five (500) hours of video content are uploaded to YouTube every passing minute.

30.     In 2020 alone, YouTube boasted thirty-seven (37) million channels, 1.3 billion people used YouTube, three hundred (300) hours of video were uploaded every minute, and five billion videos were uploaded every day.

31.     As recently as the last few weeks, Defendant has been actively censoring any coverage, direct or indirect, of conservatives. Right Side Broadcasting Network (RSBN) was

suspended for seven (7) days from YouTube's platform, preventing it from livestreaming a rally held by President Trump in Sarasota, Florida on the basis that they had violated YouTube's Community Guidelines. Freedom Watch was also suspended for publishing on YouTube Dr. Judy Mikovits' criticism of Dr. Anthony Fauci and the Covid-19 vaccines.

32. On the other hand, on July 3, 2021, police arrested a group of eleven (11) heavily armed people who call themselves "The Rise of the Moors" after an armed standoff in the middle of a highway near Boston, Massachusetts. According to local police, the group claimed that they did not recognize U.S. or Massachusetts law. Yet this group has a YouTube account and spreads their message there without their account being taken down.

33. As discussed in the Harvard Journal of Law & Public Policy, Leary, Mary Graw, *The Indecency and Injustice of Section 230 of the Communications Decency Act, Vol. 41, No. 2,* pg. 564, 565 (2018):

> Congress expressly stated that th[is] is the policy of the United States 'to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.' That said, Congress appeared to recognize that unlimited tort-based lawsuits would threaten the then-fragile Internet and the 'freedom of speech in the new and burgeoning Internet medium.'
>
> Although these two goals required some balancing, it was clear from the text and legislative history of § 230 that it was never intended to provide a form of absolute immunity for any and all actions taken by interactive computer services. Section 230 is not 'a general prohibition of civil liability for web-site operators and other content hosts.' Rather, Congress sought to provide limited protections for limited actions

34. In passing 230(c), Congress permits, but does not mandate, action by social media platforms: Section 230(c) permits YouTube to take down or block speech deemed

"objectionable… whether or not such material is constitutionally protected." Section 230(c) also pre-empts all conflicting state laws, preventing such censorship from being "made illegal… by any provisions of the laws of a State."

35.     In relying on the permissive language of Section 230 and statements and actions of Democrat legislators, those legislators made it clear that they had a "strong preference" for the censoring of the views and content of conservatives like Freedom Watch, for example:

COVID-19 "misinformation," including the lack of safety and efficacy of hydroxychloroquine and the use of face masks.

COVID-19 originated in the Wuhan province of China and was a transmission from scientists in a government.

Questioning the integrity and results of the 2020 Presidential election

36.     Freedom Watch was not "free to decline" the speech restrictions imposed by YouTube in its Terms of Service (TOS) if they wished to use the YouTube platform. Use of its platform was expressly conditioned on agreeing to these restrictions, or User access was denied.

37.     Federal actors are also sharing the fruits of YouTube censorship of conservatives like Freedom Watch. These benefits include:

a.      The Centers for Disease Control and Prevention (CDC) and the White House have used Defendants to inexpensively and effectively promote their directives, messages, and policies concerning COVID-19; and suppress contradictory medical views and conten

b.      Suppression of information suggesting or showing flaws in CDC and/or otherfederal governmental policy;

c.      Increasing the number of visitors to the CDC's website;

     d.     Boosting the CDC's highly questionable reputation as reliable and authoritative in its factual and policy determinations;

     e.     Creating a false impression of unequivocal support in the scientific community for the CDC and other governmental directives;

     f.     And suppression of opinions and information that might lead people to take actions contrary to the government's preferences.

38.     The CDC has publicly stated that it works with "social media partners," including YouTube, to "curb the spread of vaccine misinformation." In a document dated October 11, 2019, the CDC expressly stated that it was "engaging . . . partners" to "contain the spread of [vaccine] misinformation" and specifically states that the CDC would "work with social media companies" to that end.

39.     YouTube is among the social media "partners" referred to by the CDC.

40.     As is often the case within the medical community, experts disagree. Leading experts within the CDC have had sharp disagreements with the CDC policy.

41.     For example, Martin Kulldorff, nationally renowned infectious disease epidemiologist and biostatistician of Harvard Medical School, was part of the CDC's vaccine safety advisory committee but was removed from it as soon as he publicly disagreed with the agency's pause of the Johnson and Johnson COVID vaccine. The committee accused him of "bias."

42.     Four days after he was removed, the CDC once again allowed the Johnson and Johnson vaccine to be administered, effectively adopting Kuldorff's stated position for which he was punished.

43.     Pierre Kory, MD, was the medical director for the Trauma and Life Support

Center, in the outpatient pulmonary medicine clinic, at UW Health at the University of Wisconsin, where he performed bronchoscopy and pleural procedures. Kory is an expert in critical care ultrasonography, winning the British Medical Association's 2015 President's Choice award in medical textbooks for his work on Point of Care Ultrasound, along with his co-editors.

44.     Kory is also the president of the Front Line COVID-19 Critical Care (FLCCC) Alliance.  The FLCCC Alliance describes itself on its website as the following:

> [A] group of highly published, world renowned Critical Care physician/scholars –
> with the academic support of allied physicians from around the world – to
> research and develop lifesaving protocols for the prevention and treatment of
> COVID-19 in all stagesof illness.

45.     In December, Kory was called to testify before the Senate Homeland Security Committee and spoke about Ivermectin, which the FLCCC Alliance describes as an "FDA-approved anti-parasitic agent" that "had been shown in numerous controlled trials around the world to prevent and treat COVID-19." YouTube banned Kory's Congressional testimony because he promoted Ivermectin.

46.      The FLCCC Alliance condemned YouTube's censorship in a press release. It is more dangerous for social media giants like YouTube to indiscriminately discredit and summarily remove official government information given under oath by world-renowned medical experts. Kory told Fox News that, "[This is] not only a slippery slope but in contradiction to one of our most valued founding principles as a country."

47.     The FLCCC Alliance has written extensively about Ivermectin. It has, in part, stated as follows:

[The FLCCC Alliance] discovered that Ivermectin, an anti-parasitic medicine, has highlypotent anti-viral and anti-inflammatory properties against COVID-19…

Fortunately, it now appears that Ivermectin, a widely used anti-parasitic medicine with known anti-viral and anti-inflammatory properties is proving a highly potent and multi- phase effective treatment against COVID-19. (FLCCC Ivermectin in the prophylaxis andtreatment of COVID-19 | Page 1)

48.    Plaintiff's uploads about COVID-19 were censored by YouTube, as only the narrative crafted by Dr. Fauci, National Institute of Allergy and Infectious Diseases, and CDC was allowed on YouTube regarding best practices for treatingCOVID-19.

49.     Well-known American journalist Sharyl Attkisson from CBS states that she was censored: "YouTube has removed the 'Full Measure' investigation that followed the money regarding hydroxychloroquine and the IV medicine Remdesivir, calling the story 'dangerous.' It is chilling to see third parties with so much control respond to the behest of propagandists who are desperate to control the message and keep certain facts hidden."

50.    The following is her lead-in to her interview with Plaintiff: "If you've watched thenews lately, you might be under the impression that a medicine President Trump touted as a possible game-changer against coronavirus—has been debunked and discredited. Two divergent views of the drug hydroxychloroquine have emerged: the negative one widely reported in the press and another side you've probably heard less about. Never has a discussion about choices of medicine been so laced with political overtones. Today, how politics, money, and medicine intersect with coronavirus."  (Sharyl Attkisson Website)

51.    The following is an excerpt of her interview:

President Trump: Now, it may not work, in which case, hey, it didn't work.

14

Sharyl: Studies from China and France sparked early hope that a malaria drug—hydroxychloroquine— might work against coronavirus.

President Trump: And it may work, in which case it's going to save a lot of lives.

Sharyl: But with President Trump's first endorsement, there was a major media-driven effort to portray hydroxychloroquine as dangerous quackery. The campaign was assisted by an online report in mid-April. It said for sick coronavirus patients treated by the Veterans Administration, hydroxychloroquine did not help and was linked to increased deaths. She has placed her interview and report on her own website to prevent a total silencing.  It is, (Full Measure News)

52.     President Trump  and Freedom Watch have also expressed the view on YouTube that COVID-19 originated in the Wuhan laboratory in China and would specifically refer to it as the "China virus."

53.     Subsequently, YouTube Users posting comments discussing the Wuhan laboratory in China as the origin of COVID-19 or referring to COVID-19 as the "China virus" were similarly censored (flagged, demonetized, banned, etc.)

54.     For example, Jennifer Zeng, who blogged about the now widely accepted Wuhan lab leak theory and posted about it on YouTube, was censored. YouTube sent her a message stating, "We've determined that your channel is no longer eligible for monetization."

55.     Uploads concerning a lack of integrity in the 2020 Presidential election were then similarly censored.

56.     For example, Right Side Broadcasting Network was censored for posting one of President Trump's speeches. Additionally, Right Side Broadcasting Network's channel was suspended earlier on February 28, 2021, for streaming President Trump's speech from the

Conservative Political Action Committee, often called "C-PAC." The channel was suspended for two weeks.

### FACTS PERTAINING TO FREEDOM WATCH'S YOUTUBE CHANNEL

57.     Freedom Watch has maintained a YouTube channel since September of 2010, and has amassed nearly 8 million views on its videos during that time.

58.     Freedom Watch has experienced steady growth on its channel from its inception up until about five (5) years ago, when its growth suddenly plateaued. This conduct is continuing to the present.

59.     On information and belief, this stagnated growth is a direct result of the actions of the Defendants in actively censoring Freedom Watch's content and using its algorithm to drive viewers away from Freedom Watch's channel.

60.     On information and belief, this is accomplished by two means—first, people who are subscribed to Freedom Watch's channel were no longer receiving updates on Freedom Watch's new videos and second, Freedom Watch's content was not being shown to unsubscribed YouTube users who are potentially interested in Freedom Watch's content.

61.     In addition, Defendants have also now twice suspended Freedom Watch's YouTube account in an attempt to censor and suppress Freedom Watch's viewpoints.

62.     Most recently, Freedom Watch held its Third Continental Congress in Philadelphia, Pennsylvania, and had as delegate speaker Dr. Judy Mikovits.

63.     Dr. Mikovits spoke about the COVID-19 pandemic, based on her medical and other expertise, and this video was put up on YouTube.

64.     Defendants responded by deleting the Dr. Mikovits video and suspending Freedom Watch's YouTube account.

65.     This is textbook viewpoint discrimination and illegal censorship under the First Amendment to the Constitution.

## FIRST CAUSE OF ACTION
### *Violation of the First Amendment to the United States Constitution*

66.     Plaintiff Freedom Watch re-alleges and incorporates by reference the allegations in the preceding paragraphs of this Complaint as if fully set forth herein.

67.     Pursuant to Section 230, Defendants are encouraged and immunized by Congress to censor constitutionally protected speech on the Internet, including by and among its approximately 2.3 billion users that are citizens of the United States.

68.     Using its authority under Section 230 together and in concert with other social media companies, the Defendants regulates the content of speech over a vast swath of the Internet.

69.     Defendants are vulnerable to and react to coercive pressure from the federal government, Democrat legislators and President Biden to regulate specific speech.

70.     In censoring the specific speech at issue in this lawsuit and suspending Plaintiff, Defendants were acting in concert with federal officials, including officials at the CDC and the (Biden) White House.

71.     As such, Defendants' censorship activities amount to state action.

72.     Defendants' censoring the Plaintiff's YouTube channel violates the First Amendment to the United States Constitution because it eliminates the Plaintiff's participation in

a public forum and the right to communicate to others their content and point of view.

73.     Defendants' censoring of the Plaintiff from its YouTube channel violates the First Amendment because it imposes viewpoint and content based restrictions on the Plaintiff's access to information, views, and content otherwise available to the general public.

74.     Defendants' censoring of the Plaintiff violates the First Amendment because it imposes a prior restraint on free speech and has a chilling effect on social media Users and non-Users alike.

75.     Defendants' blocking of Plaintiff from its YouTube channels violates the First Amendment because it imposes a viewpoint and content-based restriction on the ability of the Plaintiff to petition the government for redress of grievances.

76.     Defendants' censorship of the Plaintiff from its channel violates the First Amendment because it imposes a viewpoint and content-based restriction on their ability to speak and the public's right to hear and respond.

77.     Defendant Pichai is sued in his personal capacity and is liable in damages because he was personally responsible for YouTube's unconstitutional censorship of the Plaintiff, including YouTube's suspension of Plaintiff.

78.     Defendant Pichai is also sued in his official capacity, along with YouTube itself, for injunctive relief to and for the unconstitutional censorship of the Plaintiff including YouTube's suspension of Plaintiff.

**SECOND CAUSE OF ACTION**
***Declaratory Judgment of Unconstitutionality of Section 2230 and the Communications Decency Act***

79.     Plaintiff Freedom Watch re-alleges and incorporates by reference the allegations in the preceding paragraphs of this Complaint as if fully set forth herein.

80.     In censoring Plaintiff, Defendants relied upon and acted pursuant to Section 230 of the Communications Decency Act.

81.     Defendants would not have censored and suspended Plaintiff but for the immunity purportedly offered by Section 230.

82.     Section 230(c)(2) purports to immunize social media companies from liability for action taken by them to block, restrict, or refuse to carry "objectionable" speech even if that speech is "constitutionally protected." 47 U.S.C. § 230(c)(2).

83.     In addition, Section 230(c)(1) also has been interpreted as furnishing an additional immunity to social media companies for action taken by them to block, restrict, or refuse to carry constitutionally protected speech.

84.     Section 230(c)(1) and 230(c)(2) were deliberately enacted by Congress to induce, encourage, and promote social medial companies to accomplish an objective—the censorship of supposedly "objectionable" but constitutionally protected speech on the Internet—that Congress could not constitutionally accomplish itself.

85.     Congress cannot lawfully induce, encourage, or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 US 455, 465 (1973).

86.     Section 230(c)(2) is therefore unconstitutional on its face, and Section 230(c)(1) is likewise unconstitutional insofar as it has been interpreted to immunize social media companies

19

for action they take to censor constitutionally protected speech.

*87.*    Section 230(c)(2) on its face, as well as Section 230(c)(1) when interpreted as described above, are also subject to heightened First Amendment scrutiny as content- and viewpoint-based regulations authorizing and encouraging large social media companies to censor constitutionally protected speech on the basis of its supposedly objectionable content and viewpoint. *See Denver Area Educational Telecommunications Consortium, Inc. v. FCC*, 518 U.S. 727 (1996)*.*

88.    Such heightened scrutiny cannot be satisfied here because Section 230 is not narrowly tailored, but rather a blank check issued to private companies holding unprecedented power over the content of public discourse to censor constitutionally protected speech with impunity, resulting in a grave threat to the freedom of expression and to democracy itself; because the word "objectionable" in Section 230 is so ill-defined, vague and capacious that it results in systematic viewpoint-based censorship of political speech, rather than merely the protection of children from obscene or sexually explicit speech as was its original intent; because Section 230 purports to immunize social media companies for censoring speech on the basis of viewpoint, not merely content; because Section 230 has turned a handful of private behemoth companies into "ministries of truth" and into the arbiters of what information and viewpoints can and cannot be uttered or heard by hundreds of millions of Americans; and because the legitimate interests behind Section 230 could have been served through far less speech-restrictive measures.

89.    Accordingly, Plaintiff seeks a declaration that Section 230(c)(1) and (c)(2) are unconstitutional insofar as they purport to immunize from liability social media companies and

other Internet platforms for actions they take to censor constitutionally protected speech.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff FREEDOM WATCH prays for judgment against Defendants as follows:

A.      An award of Compensatory and Punitive damages to the Plaintiff in an amount to be determined at trial;

B.      An injunction and declaratory judgment ordering YouTube to immediately reinstate access of Plaintiff to their YouTube account;

C.      An injunction and declaratory judgment ordering YouTube to remove its warning labels and misclassification of all content of the Plaintiff and to desist from any further warnings or classifications;

D.      Adjudgment declaring Sections 230(c)(1) and (c)(2) of the Communications Decency Act of 1996 unconstitutional;

E.      An award of attorneys' fees and costs to Plaintiff in an amount to be determined; and

F.      An award of punitive damages to Plaintiff in an amount to be determined at trial.

G.      An award of such other and further relief as the Court may deem just and proper.

### **PLAINTIFF DEMANDS TRIAL BY JURY ON ALL CLAIMS SO TRIABLE.**

Dated:  July 21, 2021                           Respectfully submitted,

                                        /s/ Larry Klayman
                                        Larry Klayman, Esq.
                                        General Counsel

FL Bar No. 246220
**FREEDOM WATCH, INC.**
7050 W. Palmetto Park Road
Boca Raton, FL  33433
Tel.:  561-558-5536
Email:  leklayman@gmail.com